## In the United States District Court
## For the District of Columbia

| | | |
|---|---|---|
| **United States of America** | ) | **Case No. 1:21-cr-00263-TSC** |
| | ) | |
| **v.** | ) | **Why a split sentence satisfies every** |
| | ) | **sentencing factor: Mr. Alford's** |
| **Russell D. Alford** | ) | **Sentencing Memorandum** |

INTRODUCTION: PERSON A VS. PERSON B VS. PERSON C VS. PERSON D

Person A was inside the United States Capitol for 12 minutes on January 6, 2021. He did not damage any property or commit an assault. When contacted by the FBI, Person A erased his social media accounts, and did not turn over a body-worn camera recording he made on January 6.

Person B was inside the Capitol for 14 minutes on January 6, 2021. He did not damage any property or commit an assault. When contacted by the FBI, he answered every question and handed over his mobile telephone.

Person C was inside the Capitol for 27 minutes on January 6, 2021. He proclaimed it was "Civil War 2," climbed on the statues in the Capitol Rotunda, and after he left the building, he climbed on top of a police car.

Person D didn't go inside the Capitol on January 6, 2021, but he smashed out some of its windows, and waved at others to join him.

1

Person A is Matthew Mazzocco. This Court sentenced him to 45 days in prison.

Person C is Elliot Bishai. This Court sentenced him to 14 days in prison.

Person D is Hunter Ehmke. This Court sentenced him to 60 days in prison.

Person B is Russell Alford. He comes before this Honorable Court for sentencing on February 2, 2023. His guidelines range is 10-16 months.

Unlike the other defendants referenced here, Mr. Alford proceeded to trial, and the jury adjudged him guilty on all four counts. Mr. Alford respects the jury's verdict and this Honorable Court's responsibility to impose sentence.

The absence of a guilty plea and accordant charge-bargaining are the key distinctions between Mr. Alford and the individuals described above, and other January 6 defendants this Court has sentenced. Mr. Alford recognizes that the Court must take this reality into account. But he respectfully submits that those factors do not entirely bridge the wide gulf between the sentences those individuals received and the advisory guidelines range here. Mr. Alford therefore asks this Court to impose a sentence of not more than 5 months in custody, a disposition that will avoid an unwarranted sentencing disparity and appropriately balance the other applicable statutory sentencing factors. Mr. Alford's guideline range of 10-16 months falls within Zone C of the sentencing table, making a 5-month custodial sentence, to be followed by a 5-month term of home confinement, a guideline sentence.

I.      **Mr. Alford's background and life both before and after January 6, 2021.**

    A.   <u>After growing up in California, Mr. Alford eventually settled in Florida before moving to Hokes Bluff, Alabama to care for his ailing mother</u>

Born into a military family, Mr. Alford moved around a good bit as a child before his parents settled in Southern California, where he grew up in the 1960s and 1970s. Although his dad struggled with alcoholism, Mr. Alford was very close to his mom and brothers, and enjoyed a largely happy childhood. He was good at sports, and recalls being drafted by a professional baseball team. Mr. Alford elected to enter the workforce instead, and would spend parts of the next five decades working almost exclusively in automobile body shops.

In his early 20s, Mr. Alford married. The union was a happy one at first, and Mr. Alford hoped to expand their family. Unfortunately, the couple divorced over a disagreement on whether to have children, and Mr. Alford never remarried. He does have a son from a later relationship, but the couple separated when the boy was five years old. After the boy's mother married another man, Mr. Alford was no longer allowed to be a part of the boy's life. To Mr. Alford's sorrow, years would pass without any contact with his son. But, to his delight, Mr. Alford's now-adult son responded positively to his attempts to reconnect several years ago, and Mr. Alford is grateful for the relationship they have built.

After a number of years in California, Mr. Alford relocated to Florida in the mid-1990s. He continued to work in auto body shops there, and enjoyed his life and circle of friends. But his mother, who had moved back to her native Alabama after

divorcing Mr. Alford's father, began to experience a sharp health decline. By the early 2000s, it was evident that Mr. Alford's mother, who suffered from a variety of serious medical conditions, needed around-the-clock care. None of Mr. Alford's siblings were in a position to take her in or relocate, so Mr. Alford moved to somewhere he'd never before lived, and had only briefly visited over the years: Hokes Bluff, Alabama. He commuted to Birmingham at first for work at car dealerships and auto body shops before ultimately starting his own business, Alford's Paint and Body, in Hokes Bluff. Mr. Alford opened the business in 2011 and served as the sole proprietor and, for the most part, the sole employee. He reveled in being able to do the work he loved, on his own terms, and in the accordant flexibility it left him to care for his ailing mother, who required three major surgeries during those years, in addition to her chronic conditions.

Mr. Alford cherished the 12 years he spent caring for his mother. Though some of the days were hard, particularly in the wake of multiple surgical procedures, Mr. Alford is grateful to have been able to care for the person who, despite difficulties in her own life, poured so much into him as a child and as a young man. Mrs. Alford passed away in 2017 at the age of 92, and although her son is thankful that she is no longer in pain, he misses her very much.

Today, Mr. Alford is semi-retired, but still maintains his auto body shop. He's almost gotten the mortgage paid off, and he hopes one day to sell the business and retire completely. For now, Mr. Alford lives with his dog in a "tiny home" behind the body shop. Mr. Alford has a small circle of friends in the area, but largely keeps to

himself. He tends his business and enjoys fostering stray dogs for the local humane society. A good friend of Mr. Alford's who has known him for more than a decade, retired Col. Leonard H. Kiser, writes that he has found Mr. Alford "to be an honest, loyal and forthright individual" who has "never displayed anger in my presence and I have never heard anyone that has had an issue with him."[1]

    B.  <u>Mr. Alford's reaction to the 2020 Presidential Election and decision to be in Washington on January 6, 2021</u>

Mr. Alford staunchly supported then-President Trump's reelection bid. Following President Biden's victory, Mr. Alford supported Mr. Trump's challenges to the election results. Over the time period between the election and January 6, the former President told his supporters that he had been cheated. He railed against President-elect Biden, the Democratic Party, the federal courts, his own government, and any other person or entity he could find to accuse of malfeasance. Mr. Trump and his enablers urged Trump supporters nationwide, including Mr. Alford, to buy into the false narrative that he was the true winner of the election.

Mr. Alford believed, and still believes, the former President. And, through his Facebook account, Mr. Alford found commiseration and camaraderie among others who shared his belief in Mr. Trump's allegations of election fraud. Mr. Alford wanted to attend a Trump rally to show his support for the man and his election challenge, and to be among like-minded people in-person.

---

[1] *See* Ltr. of United States Army Colonel Leonard H. Kiser (ret.), attached as Exhibit 1.

And so, after musing about a trip to Washington for several weeks and absorbing the then-President's unceasing falsehoods on social media, Mr. Alford decided to attend his rally on January 6, 2021. He made arrangements with a local man to ride with him and split gas money, found a hotel online, and set off.

C.  Mr. Alford's conduct on January 6, 2021

Mr. Alford attended Mr. Trump's rally at the Ellipse on January 6. He was still there during the Peace Circle breach. After leaving the rally, Mr. Alford walked along the edge of the National Mall to the Capitol Building, taking the least-crowded route he could discern. Seeing the large group of people gathered on the West Front, Mr. Alford made his way to the East Front. He lingered there for awhile and took some photographs. While he was doing so, unknown to Mr. Alford at the time, the first breach of the building occurred near the Senate Wing Door on the West Front. Mr. Alford at that moment was taking a photo of the Capitol dome and the people gathered on the East Front stairs.

After a time, Mr. Alford walked over to the Upper House stairs and ascended them. He uploaded an earlier photo he'd taken to Facebook. Then, seeing the Upper House Door had been opened, he entered the Capitol Building. While inside, Mr. Alford did not assault, or even speak with, law enforcement, or anyone. He damaged no property. For most of the 14 minutes Mr. Alford was in the building, he stood against the wall, taking a few photographs and videos, some of which he later uploaded to Facebook. Once law enforcement began to clear the building, Mr. Alford was at the door within seconds, and left about two minutes later.

Once outside, Mr. Alford found his riding companion and left the Capitol grounds. He walked back to his car, drove to the hotel, and left early the next morning for Hokes Bluff.

Two weeks later, on January 20, 2021, President Biden was inaugurated. On that same day, two FBI agents came to Mr. Alford's body shop. He freely admitted to entering the Capitol on January 6, answered every question posed to him, and attempted to e-mail the agents the videos he'd taken inside the Capitol that day. When the e-mail did not go through, Mr. Alford cooperated with the FBI to get them by other means, including permitting them to make a digital copy of his mobile telephone. After being formally charged, Mr. Alford drove himself to the federal courthouse in Birmingham to turn himself in, as the FBI instructed him to do. Upon his arrival, the FBI asked to copy Mr. Alford's mobile telephone a second time. Again, he agreed. Following his voluntary surrender, Mr. Alford was released on bond. As of this filing, almost than 22 months later, Mr. Alford has fully complied with his bond conditions. He appeared as ordered to stand trial in Washington in September and October of 2022 and has continued to obey all bond conditions and his supervising probation officer's instructions following the jury's guilty verdict.

## II.   Mr. Alford's decision to proceed to trial cannot alone justify a fully custodial, within-guidelines sentence.

To counsel's knowledge, as of this filing this Court has not yet sentenced an individual in a January 6 case following a jury trial on the charges for which Mr. Alford will be sentenced. With the notable exception of his decision to proceed to trial rather than charge-bargaining into a plea, the facts of Mr. Alford's case are

comparable to those of numerous January 6 defendants whose sentences have

numbered in the days, not months. Mr. Alford does not suggest that the Court

disregard this distinction, but he respectfully submits that permitting it to subsume

all other statutory sentencing considerations would result in a greater-than-

necessary sentence. The totality of the pertinent sentencing factors[2] here suggest

that even a low-end custodial sentence would represent an unwarranted sentencing

disparity unjustified by the facts of Mr. Alford's case. Such a sentence would also

cross the line from factoring in Mr. Alford's decision to stand trial and testify, and

into unfairly punishing him for exercising his Sixth Amendment rights.

A. <u>A fully custodial guidelines sentence for Mr. Alford would result in an unwarranted disparity, in violation of 18 U.S.C. § 3553(a)(6)</u>

This Court should not sentence Mr. Alford within the guideline range simply

because the key difference between him and numerous other January 6 defendants

who received far lower sentences was that he went to trial and testified.[3] Although

all of the defendants described below pleaded guilty, and it is certainly appropriate

for this Court to incorporate this into its analysis, [4] Mr. Alford respectfully submits

---

[2] In addition to the considerations discussed below, the sentencing statute directs the Court to consider "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). As of this filing, the government has not submitted a request for restitution. Of course, as noted, Mr. Alford did not personally cause any damage to the Capitol or to anyone there that on that day. And Mr. Alford does not require educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a)(2)(D).

[3] Mr. Alford acknowledges that he is not privy to the same amount of information as this Court was at the time it imposed the below-described sentences in other January 6 cases. His argument is drawn from information available in the public record.

[4] Of course, although a plea of guilty conserves judicial and other resources and constitutes an official acceptance of responsibility, it does not necessarily indicate sincere remorse. *See United States v. Matthew Mazzocco*, 1:21-cr-00054-TSC, ECF No. 32 at 29-30, ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went

that this one distinction does not alone support such a stark disparity—particularly

when his actual, "real conduct" on January 6 is of a similar or less serious nature

than many defendants described below. As retired Justice Breyer wrote for the

Supreme Court in *United States v. Booker*, "Congress' basic statutory goal—a

system that diminishes sentencing disparity—depends for its success upon judicial

efforts to determine, and to base punishment upon, the **real conduct** that

underlies the crime of conviction." 543 U.S. 220, 250 (2005) (emphasis added). This

principle was emphasized in the *Booker* Court's ultimate decision to render the

guidelines advisory, "while maintaining a strong connection between the sentence

imposed and the offender's real conduct—a connection important to the increased

uniformity of sentencing that Congress intended its Guidelines system to achieve."

*Id.* at 246.

With that principle in mind, Mr. Alford offers the below survey[5] of sentences

this Court has imposed on other January 6 defendants and asks the Court to

consider his "real conduct" in the context of theirs.[6]

---

home. It came when he realized he was in trouble. It came when he realized that large
numbers of Americans and people worldwide were horrified at what happened that day. It
came when he realized that he could go to jail for what he did. And that is when he felt
remorse, and that is when he took responsibility for his actions.")

[5] A table of this Court's sentences of January 6 defendants is attached to this pleading as
Exhibit 2.

[6] Although Mr. Alford focuses his analysis on this Court's January 6 sentencings, the
overall thrust of the sentences imposed by this Court's colleagues also support his
argument. A recent WASHINGTON POST analysis revealed that the average sentences among
misdemeanor defendants who receive jail time is 48 days. *See* Tom Jackman and Spencer S.
Hsu, "Review of Jan. 6 cases finds judges give harsh lectures, lighter sentences," THE
WASHINGTON POST, Jan. 6, 2023, available at https://www.washingtonpost.com/dc-md-

i)    *Petty offense or misdemeanor defendants sentenced to 14 days of custody*

This Court has sentenced the following defendants convicted of a petty offense or misdemeanor to 14 days of custody: Donna Bissey (1:21-CR-00165-TSC), Elliot Bishai (1:21-CR-00282-TSC), Stephanie Miller (1:21-CR-00266-TSC), Letita Ferreira (1:22-CR-00210-TSC), Nicholas Lattanzi (1:22-CR-00028-TSC), and Michael G. McCormick (1:21-CR-00710-TSC). Most of these individuals were inside the Capitol for time periods comparable to the 14 minutes Mr. Alford was in the building, with the exception of Mr. Bishai, who was inside for 27 minutes, and Ms. Ferreira, who was in the building for 45 minutes. Mr. Bishai, for one, was also far more strident in his conduct on January 6 than Mr. Alford. He shouted "Civil War 2!," climbed statues in the Rotunda, and mounted a police car following his exit from the building. ("Statement of Offense," ECF No. 71 at 4-5, *United States v. Bishai*, 1:21-CR-00282-TSC.) Ms. Ferrerira was not entirely truthful with the FBI, and proceeded further into the Capitol than Mr. Alford. (ECF No. 32 at 2, *United States v. Ferreira*, 1:22-cr-00210-TSC.)

ii)   *Petty offense and misdemeanor defendants sentenced to between 20 and 60 days of custody*

Petty offense or misdemeanor defendants to whom the Court has sentenced to between 20 and 60 days of custody include Benjamin Larocca (1:21-CR-00317-TSC), Matthew Mazzocco (1:21-CR-00054-TSC), Cory Brannan (1:21-CR-00637-TSC), Brandon Miller (1:21-CR-00266-TSC), Edward E. Hemenway (1:21-CR-00049-

---

va/2023/01/06/jan6-capitol-riot-sentencings/ (last viewed on Jan. 11, 2023). When all misdemeanor defendants are considered, the average drops to 22 days. *See id.*

TSC), Robert L. Bauer (1:21-CR-00049-TSC), Nicholas Perretta (1:21-CR-00539-TSC), and Mitchell Vukich (1:21-CR-00539-TSC). The circumstances of these cases tend to include more aggravating factors than are present in Mr. Alford's case, including the destruction of evidence (Mr. Mazzocco and Mr. Bauer); donning tactical gear (Mr. Brannan, who was also a former corrections officer); cursing at law enforcement (Mr. Miller); proceeding deeper into the Capitol building, up to its third floor (Mr. Perretta and Mr. Vukich); and stealing paperwork from the Capitol (Mr. Vukich).

### iii)    Felony sentences **lower** than Mr. Alford's requested sentence

Several of this Court's sentences in January 6 felony cases warrant mention.[7] The first is Christian Cortez, convicted of felony Civil Disorder, in violation of 18 U.S.C. § 231(a)(3). Mr. Cortez confronted law enforcement as they struggled to close the North Doors of the Capitol. According to the Statement of the Offense, Mr. Cortez taunted and shouted obscenities at the officers, stood in front of the door, slammed down a flag, and had to be pepper sprayed by law enforcement officers, forcing them to turn their attention to him and away from the effort to secure the North Doors. ("Statement of Offense," ECF No. 55 at 4-5, *United States v. Cortez*, 1:21-cr-00317-TSC.) As noted by the Court, Mr. Cortez also yelled for his fellow rioters to hold their positions as law enforcement tried to contain them. (ECF No. 80

---

[7] Mr. Alford recognizes that the Court has sentenced other January 6 defendants convicted of felony offenses to far lengthier terms of imprisonment. *See, e.g., United States v. Palmer*, 1:21-CR-00328-TSC (63 months); *United States v. Ponder*, 1:21-CR-00259-TSC (63 months); *United States v. Capsel*, 1:22-CR-00107-TSC (18 months). Those defendants' conduct on January 6 differs vastly from Mr. Alford's.

at 45, *United States v. Cortez*, 1:21-cr-00317-TSC.) This Court sentenced him to 4 months.

Hunter Ehmke came before this Court following a plea of destruction of government property, in violation of 18 U.S.C. § 1361. Mr. Ehmke personally smashed out windows on the East Front of the Capitol, and waved others towards the window. (ECF No. 31 at 7-8, *United States v. Ehmke*, 1:21-cr-00029-TSC). This Court imposed a 4-month prison sentence.

Kenneth Grayson was in the Capitol for 47 minutes, some three times longer than Mr. Alford. He made multiple trips to Washington between the 2020 Presidential Election and January 6, boasted about assaulting a counter-protestor,[8] and stated ahead of time on social media that he would storm the Capitol if Donald Trump told him to do so. (ECF No. 44 at 3, *United States v. Grayson*, 1:21-cr-00224-TSC.)  While inside the Capitol, Mr. Grayson twice joined a group of rioters trying to push past a row of law enforcement officers in the Rotunda, in an attempt to penetrate deeper into the building. (*Id.* at 4.) This Court sentenced Mr. Grayson to 2 months in custody.

### iv)   Other notable felony sentencings

Two other felony cases warrant mention: Moises Romero and Christine Priola. Mr. Romero pleaded to civil disorder and faced a guideline range of 8-14 months, lower than Mr. Alford's range of 10-16 months. This is despite the fact that Mr. Romero, clad in tactical gear, breached the Capitol on the West Front and, after

---

[8] His boast was never verified.

being expelled by law enforcement, went to the East Front in an attempt to reenter the Capitol. He was sentenced to 12 months and one day, the low-middle of Mr. Alford's guideline range.

Ms. Priola made it all the way to the United States Senate floor, where she telephoned another rioter to urge him to join her there, saying "This is now or never." (ECF No. 56 at 15, *United States v. Priola*, 1:22-cr-00242-TSC). Ms. Priola, who later deleted evidence from her mobile device (*id*. at 17), did not receive the two-level enhancement for obstruction that the probation office assessed on Mr. Alford. (*Id*. at 19.) This Court sentenced Ms. Priola to 15 months in prison, the low end of her guideline range and near the high end of Mr. Alford's.

B. <u>Although the guideline range must be considered per 18 U.S.C. § 3553(a)(4), it is unduly harsh in Mr. Alford's case</u>

The probation office has calculated Mr. Alford's guidelines range at 10 to 16 months, in Zone C of the sentencing table, based on a total offense level of 12 and a criminal history category of I.[9] This guidelines range, of course, accounts for Mr. Alford's decision to proceed to trial (by excluding an acceptance of responsibility reduction) and to testify at trial (by the two-level, USSG §3C1.1 enhancement). It also reflects the higher base offense level assigned to individuals convicted of 18 U.S.C. § 1752(a)(2)—Count Two of Mr. Alford's Information—than would apply under § 1752(a)(1)—Count One of the Information.

---

[9] *See* PSR at ¶ 85.

Had Mr. Alford's guidelines been calculated under USSG §2B2.3, the guideline for § 1752(a)(1), the only other non-petty offense, he would have faced a range of 0 to 6 months in prison, even with the obstruction enhancement. Or, had he been convicted only of one or both petty offenses, as charged in Counts Three and Four of the Information, Mr. Alford would have no guidelines range at all, facing a statutory range of 0 to 6 months in prison. As illustrated on the below chart, the conviction for Count Two has an outsized impact on Mr. Alford's sentencing exposure.

| Count of conviction | Applicable Sentencing Guideline | Sentencing Guideline Range | Statutory Range |
|---|---|---|---|
| 18 U.S.C. § 1752(a)(1) | USSG §2B2.3, "Trespass" | 0-6 months, Zone A | 0-12 months |
| 18 U.S.C. § 1752(a)(2) | USSG §2A2.4, "Obstructing or Impeding Officers" | 10-16 months, Zone C | 0-12 months |
| 40 U.S.C. § 5104(e)(2)(D) | N/A; petty offense | N/A | 0-6 months |
| 40 U.S.C. § 5104(e)(2)(G) | N/A; petty offense | N/A | 0-6 months |

Mr. Alford highlights this not to suggest that the probation office's calculations are incorrect; indeed, the guidelines range in Mr. Alford's PSR comports with the letter of the Guidelines Manual. But this guidelines range is too harsh under the facts of this case. For one, Mr. Alford's guidelines being enhanced for testifying at trial received the same increase as someone who attempted to—or did—obstruct justice in a more egregious manner. The guideline makes no allowance for the seriousness of any defendant's obstructive conduct by instituting a tiered system of enhancements. *Compare* USSG §3B1.1, §3B1.2 (aggravating and

14

mitigating role adjustments, allowing for four, three, or two levels, as appropriate). And the obstruction enhancement couldn't be applied to anyone convicted of a petty offense, even where a defendant chose to delete or withhold evidence, rather than turning it over to the FBI like Mr. Alford. Multiple January 6 defendants sentenced by this Court have done this, including Mr. Mazzocco, who deleted evidence off his mobile phone and did not provide a body-worn camera recording he made on January 6. (*See* ECF No. 32 at 29, *United States v. Mazzocco*, 1:21-cr-00054-TSC.)

The obstruction enhancement notwithstanding, the fact that Mr. Alford's guidelines are calculated under USSG §2A2.4 is particularly excessive. Entitled "Obstructing or Impeding Officers," this guideline was applied because the offense "involved obstructing or impeding officers[.]"[10] It was undisputed at trial that Mr. Alford did not personally vandalize the Capitol building or assault anyone. There was no evidence that he even so much as spoke during his brief time inside the building, much less personally behaved in a disruptive manner. As such, although the jury convicted Mr. Alford on Count Two, it could only have done so on the basis that Mr. Alford's presence in the Capitol—in tandem with that of numerous other individuals—was necessarily disorderly and disruptive conduct that obstructed or impeded government business. That places Mr. Alford under the same guideline as other defendants—including but not limited to individuals convicted of felony civil disorder[11]—who *did* vandalize the Capitol and *did* loudly chant and march through

---

[10] PSR at ¶ 27.

[11] This same §2A2.4 guideline would have applied to Mr. Alford had he been convicted of felony civil disorder. *See United States v. Romero*, 1:21-cr-00677-TSC, ECF No. 29 at 33.

its halls, and fails to meaningfully distinguish his conduct from theirs. As noted above, under any other conviction scenario, Mr. Alford would face a range of 0-6 months, either under the guidelines or by statute. This is true even though Count Three (prohibiting Disorderly Conduct in a Capitol Building) punishes substantively the same conduct as Count Two (Disorderly and Disruptive Conduct in a Restricted Building). But of course, as a petty offense, Count Three would not implicate this heightened guideline range, or any guideline range at all.

Finally, just this month, the Sentencing Commission announced two alternatives for a proposed guideline amendment pertaining to zero-point offenders.[12] If Mr. Alford were to be sentenced under one of the two proposed alternatives,[13] he would be due a two-level *decrease* to his total offense level due to his status as an offender with no countable prior convictions.

Were Mr. Alford to be sentenced under this proposed amendment, his total offense level would be reduced to 10, resulting in a guideline range of 6-12 months, in Zone B of the sentencing table. While this amendment is not certain to be enacted, Mr. Alford asks the Court to take this proposed change into account in crafting his sentence.

---

[12] *See* U.S. SENT'G COMM'N, *Proposed Amendment to the U.S. Sentencing Guidelines (Preliminary); USSG §4C1.1, "Adjustment for Certain Zero-Point Offenders* [Option 2 (Zero-Point Offenders with No Countable Convictions)] (Jan. 12, 2023) at PDF pp. 182-83, 200, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230112_prelim_RF.pdf (last viewed on Jan. 25, 2023).

[13] Mr. Alford recognizes that, because he has prior misdemeanor convictions that did not count for criminal history points, he would not qualify under the alternative proposal, which is limited to zero-point offenders with no prior convictions at all. *See id.*

C. <u>Specific deterrence, 18 U.S.C. § 3553(a)(2)(B), and protection of the public, 18 U.S.C. § 3553(a)(2)(C)</u>

Imprisonment for more than five months is unnecessary to specifically deter Mr. Alford or protect the public. Misdemeanor offenses in the early 1990s and a failure to register a motor vehicle charge 16 years ago are Mr. Alford's only criminal history.[14] With zero criminal history points, he is in Criminal History Category I. This places Mr. Alford in a demographic that presents the lowest statistical likelihood to recidivate. A recent U.S. Sentencing Commission study concluded that an offender's "Criminal history score and Criminal History Category (CHC) are strong predictors of recidivism."[15] Offenders such as Mr. Alford in Criminal History Category I have the lowest rearrest rate, at just 33.8%, by a significant margin.[16]

Mr. Alford's age further suggests he is a good candidate for a split sentence, as "older offenders are substantially less likely to recidivate following release compared to younger cohorts."[17] Offenders in Mr. Alford's age cohort have some of the lowest rates of reconviction, at just 11.4%.[18] These statistics, consistent with Mr. Alford's minimal and dated criminal history and excellent performance on bond,

---

[14] *See* PSR ¶¶ 39-42.

[15] U.S. SENT'G COMM'N, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* at 12 (Mar. 2017), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf (last viewed on Jan. 13, 2023).

[16] *See id.*

[17] U.S. SENT'G COMM'N, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017) at 30, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (last viewed on Apr. 20, 2022).

[18] *Id.* at 23, Fig. 14.

suggest that a lengthier custodial sentence is unnecessary to protect the public or specifically deter him.

D. <u>General deterrence, and the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, 18 U.S.C. §§ 3553(a)(2)(A), (a)(2)(B)</u>

A fully custodial, within-guidelines sentence would certainly inflict *greater* punishment on Mr. Alford. But that is not the statute's mandate. What the statute requires is for the Court's sentence to mete out *just* punishment, that is sufficient, but not greater than necessary. 18 U.S.C. § 3553(a)(1). Five months in prison for entering and (quietly) remaining in the Capitol for less than 15 minutes can hardly be characterized as an unduly lenient sentence, particularly in light of the far shorter sentences imposed on other defendants. For this same reason, a split sentence presents no threat to general deterrence, and sufficiently reflects the offense's serious while promoting respect for the law. Consequently, the requested sentence will not, under the unique procedural posture and factual setting here, undermine the retribution-based statutory sentencing factors.[19] As the Supreme Court has noted, even a sentence of straight probation and its accompanying conditions are a "substantial restriction of freedom."[20]

E. <u>Mr. Alford's history and characteristics, 18 U.S.C. § 3553(a)(1)</u>

There is much to admire in Mr. Alford's life. Although it has taken some turns he would have preferred to avoid, he has consistently worked a respectable job

---

[19] *See* 18 U.S.C. §§ 3553(a)(2)(A)-(C).

[20] *Gall v. United States*, 552 U.S. 38, 48 (2007).

and, by all accounts, comported himself well, aside from some trouble with the law more than 30 years ago. Colonel Kiser's letter shows that Mr. Alford is today a valued member of his community who gets along well with others. He has lived alone since his mother's passing, punctuating this largely-solitary existence through his loyal customers, handful of friends, and the dogs he fosters through the local Humane Society. Mr. Alford has a tender heart for animals, particularly dogs, and is proud of the fact that his fosters have found loving homes both near and far from Hokes Bluff, including with families as distant as New Jersey.

Mr. Alford is also proud of the relationship he's been able to build with his adult son; the closeness he continues to enjoy with some of his siblings; and, of course, the precious time he spent caring for his mother. Any ailing parent would be indeed fortunate to have his or her child act in such a selfless manner during one's twilight years.

Much was made at trial of Mr. Alford's Facebook account, and the posts he "liked" or "shared," some of which contained impolitic or unpopular political and social views. But what should be considered is how Mr. Alford explained he used Facebook: as a means to decompress, often at the end of the workday, and without devoting significant thought to what he would "like" or "share" or say in private messages. For a single man in his sixties who lived alone and far away from most family, and with only a few friends in town, social media presented a forum for connection and community. Unfortunately, it was on this forum that Mr. Alford was

exposed to the constant stream of lies and conspiracy theories that the former President and his allies spewed about the 2020 election.

F.   Nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1)

There is no justification for the atrocious events at the Capitol on January 6. There really aren't enough adjectives to adequately characterize it. And counsel will not try. Suffice it to say that it was an unprecedented attack on American democracy that must not occur again.

Without excusing the conduct of those who instigated the events of January 6, or those who assaulted law enforcement, or those who damaged the Capitol itself, Mr. Alford respectfully urges this Court to consider his actions as an individual. Mr. Alford played no leadership role on January 6, and the only evidence of coordination with another person presented over the course of a nearly two-week jury trial were Mr. Alford's arrangements to split gas money and ride together with another Hokes Bluff-area man interested in attending the former President's rally. There was no evidence that Mr. Alford knew of the day's worst events until after he left the Capitol grounds. But there was evidence of where and when Mr. Alford was at all relevant times, and evidence of what he did during those times. Or, more precisely, there was significant evidence of what Mr. Alford did *not* do, as detailed above. In short, Mr. Alford did not assault anyone, damage property, or even speak. What he did was walk inside an open door, stand silently, make no attempt to progress beyond the hallway just beyond his entry point, move to the exit when law enforcement began clearing the corridor, and leave roughly 14 minutes after entry. And while he made and/or shared social media posts concerning the day's events,

none of them indicated that he was involved with the worst acts of that day. And, as noted above and confirmed by the government's own witness at trial, when the FBI came to Mr. Alford's body shop on January 20, 2021, he was fully cooperative then, and with every subsequent FBI contact. Unlike other defendants this Court has sentenced, Mr. Alford did not withhold or delete evidence; in fact, he went above and beyond to provide the FBI with what the agents asked him to turn over.

### III. Conclusion: Even in the context of the inexcusable events of January 6, 2021, the requested sentence is justified by Mr. Alford's actual conduct that day, and on the balance of the sentencing factors.

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011).

Consideration of this principle compels the conclusion that many involved in the events of January 6, 2021 are due to receive fully custodial guidelines sentences. Or more. Others, Mr. Alford among them, are due to receive an alternative disposition.

Mr. Alford should not have entered the Capitol on January 6, 2021. Now standing convicted of four charges related to his poor decision, Mr. Alford respectfully asks this Honorable Court to eschew rote adherence to the sentencing guidelines and instead impose a sentence that accounts for *his* individual, real

conduct, which the Court was able to observe at length over the course of his trial, and the totality of a life otherwise well-lived.

Respectfully submitted,

KEVIN L. BUTLER
Federal Public Defender
Northern District of Alabama

TOBIE J. SMITH
Appellate Attorney

**/s/ James T. Gibson**
JAMES T. GIBSON
Trial Chief
Assistant Federal Public Defender
505 20th Street North, Suite 1425
Birmingham, Alabama 35203
(205) 208-7170
James_Gibson@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2023, I electronically filed the foregoing via this Court's CM/ECF system, which will send notice of such filing to all counsel of record.

Respectfully submitted,

**/s/ James T. Gibson**
JAMES T. GIBSON