**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CASE NO. 21-cr-263 (TSC)** |
| | : | |
| **RUSSELL DEAN ALFORD,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Russell Dean Alford to a sentence of 13 months of incarceration, in the middle of the guideline range as calculated by the government and the Presentence Report, 12 months of supervised release, and $500 in restitution.

**I.      Introduction**

Defendant Russell Dean Alford participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.7 million in losses.[1]

Following a five-day jury trial, the jury found Alford guilty of Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1), Disorderly and

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C.  § 5104(e)(2)(G).

As explained herein, a sentence of a 13 months of incarceration, followed by 12 months of supervised release, and $500 in restitution is appropriate in this case because Alford: (1) walked past repeated and obvious signs that the Capitol building and grounds were restricted until he could find an unobstructed entrance into the Capitol building, (2) enter the Capitol through a door that other rioters had broken open, knowing that they had broken it open; (3) refused to leave the Capitol—and, indeed, sought to go deeper inside—after police ordered him and other rioters to leave; (4) celebrated his participation on social media, and mocked the pain and trauma suffered by officers, in the immediate aftermath of the riot; (5) spread disinformation about the riot via social media; and (6) demonstrated a lack of candor and honesty during his trial testimony.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

On January 6, 2021, the United States Capitol was closed to members of the public. In preparation for the January 6 certification vote, the U.S. Capitol Police (USCP) established a protective perimeter around the entire Capitol grounds, interconnected bike racks, mesh "snow fencing," and signs posted at regular intervals stating, "Area Closed."

Outside the Capitol, at approximately 12:55 p.m., a mob of rioters breached a police security line at the Peace Circle at around 12:55 p.m. The mob occupied the Capitol's west front, tearing down fencing. At approximately 2:12 p.m., rioters first made entry into the building through the Senate Wing Door. Shortly after this, rioters breached multiple other points of entry into the building.

As the mob massed outside the Capitol, the Joint Session of Congress assembled for the count of the Electoral College votes at 1:00 p.m. with Vice President Pence presiding.After the mob breached the building, the U.S. Secret Service evacuated the Vice President and members of his family to a more secure location in the Capitol. The Senate and House recessed for the safety of members, and members were evacuated.

Over the next several hours, USCP officers, with the assistance of other police officers, sought to reclaim the Capitol building from the mob. Some rioters resisted police violently in their efforts to clear the building. The certification proceedings did not resume until 8:00 p.m., after all rioters had been removed from the Capitol. Indeed, it could not resume while any rioters remained inside.

### Alford's Role in the January 6, 2021 Attack on the Capitol

*The Charges and Trial*

On March 22, 2021, the United States charged Alford by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 30, 2021, 2021, Alford was charged by a four-count Information with violating the same statutes. Alford appeared before this Court for a jury trial that began on September 28, 2022 and testified in his defense. On October 5, 2022 the jury found Alford guilty on all counts.

*Alford's Social Media Statements Before January 6*

As the jury found, Alford was a willing and supportive participant in the riot. Beginning days after the election, Alford contemplated breaking the law to resist the new administration; on November 15, 2020, he wrote of the new administration and the peaceful transfer of power, "Anyone who thinks I Am going to Comply with Communism, just because you Voted for it Is in For a Rude Awakening." (Government Exhibit 303.) He was aware, as early as November 8, 2020,

that the election would be adjudicated in Congress, in January. (Government Exhibit 302.) On November 22, 2020, he predicted political violence, sharing a graphic captioned "By Bullet or Ballot Restoration Of The Republic Is Coming." (Government Exhibit 306.) The ballots already had been counted, however; Alford had decided that he would not comply.

Alford began discussing travel to Washington, D.C. as early as December 10, 2020. On that day, he sent a message to a Facebook contact asking if she would be in D.C. on Saturday, which was December 12, 2020. (Government Exhibit 307.)[2] Earlier that day, he posted a message to his Facebook account, asking his network, "DC Roadtrip ?" (Government Exhibit 310.) And on December 11, 2020, Alford told a friend—with whom he would travel to Washington, D.C. on January 5, 2021—"Thinking about goin to DC tired of watching." (Government Exhibit 311.) If it was true, as Alford claimed, that he had never been to Washington, D.C., before January 6, 2021, Trial Tr. 10/04/2022 at 757, then he was considering travel even before the former President first announced the January 6 rally on December 19, 2020, via Twitter.

As January 6, 2021 approached, Alford's travel plans became more concrete. (Government Exhibits 311, 312, 313, 314, 320.) And his Facebook posts became apocalyptic. On December 30, 2020, he shared a message from one of the former President's lawyers, urging people to "Choose Wisely" "For yourself, your children, and your grandchildren." (Government Exhibit 317.) On January 3, 2021, he wrote that "When they rigged the elections they declared war on the American people." (Government Exhibit 318.) And late at night on January 4, 2021—right before he left to drive to Washington, D.C.—Alford posted a trio of messages: An image of an enormous crowd, captioned "We concede nothing! #RiggedElection"; a picture of the former President, his former

---

[2] Former President Trump also held a rally in Washington, D.C. on December 12, 2020. Similar to the rally on January 6, 2020, this rally focused on the former president's claims about the 2020 Presidential Election.

4

National Security Advisor, and two of his attorneys, warning opponents that "You can run, but you cannot hide. The day of reckoning is NOW!"; and, perhaps most tellingly, an (incorrect) theory that "The Constitution Actually says you Can legally Overthrow your Government if they Are tyrannical." (Government Exhibit 322, 323, 324.)

*Alford's Travel to Washington, D.C. and Conduct on January 6*

On January 5, 2021, Alford and a friend drove from Hokes Bluff, Alabama to Washington, D.C. They rented a hotel room outside of the city, and then went to D.C. on January 6, 2021, to attend the former President's rally. At the conclusion of the rally, the crowd—including Alford— began to walk towards the U.S. Capitol. Alford approached the Capitol from the southwest, entering the restricted area at the Garfield Circle. He walked past "Area Closed" signs and bicycle rack barricades on his way into the Capitol. To enter the restricted area around the U.S. Capitol, Alford navigated through breaches in police barricades.



(Defense Exhibit 17b (above).) Alford (circled in yellow) walked past the chaos at the West Plaza. Even if he did not see the rioters clash with police at that location, he must have heard the overwhelming sound of the crowd and would have smelled tear gas in the air. This, too, would have sent an unambiguous message to turn back. Alford disregarded this message.

Alford cut across the grounds and stepped through the bicycle barricades on his way to the

East side of the U.S. Capitol.



(Defense Exhibit 19a (above).) Alford walked past a line of officers protecting the Upper House door, through which he would enter 30 minutes later. As can be clearly seen in the video, Alford is also inside the bicycle rack barricades which designate the restricted area.



(Defense Exhibit 21c (above).) Alford then walked in front of the East Rotunda door area and witnessed the chaos at that location.



(Defense Exhibit 22d (above).)

Alford then walked back to the area directly in front of the Upper House door. In contrast to Exhibit 21c, at 2:40:15 pm when Alford was at the top of the Upper House door stairs, there were additional police cruisers blocking access to the stairs leading up to the Upper House door.



(Defense Exhibit 25b (above).) Alford reached the landing at the top of those stairs by 2:41 p.m., and entered the Upper House door at 2:43 p.m. During that time, rioters forced open the Upper House door, breaking one of the door's glass panels, and triggering an alarm that remained active throughout Alford's time in the building. In speaking with the FBI, after the fact, Alford acknowledged that he entered the Capitol building through a door that someone else had broken

open.



(Government Exhibit 103 (above).) Alford remained inside that area until the Metropolitan Police Department ("MPD")'s Civil Disturbance Unit entered the hallway and began expelling rioters. Feet away from Alford, MPD officers commanded rioters to leave through their words, through their gestures, and—in Captain Mancuso's words—by "assisting" (i.e., physically moving) rioters to the door. Confronted with these unambiguous commands to leave, Alford turned to walk away from the police, deeper into the building.



(Government Exhibit 109 (above).) Of course, Alford could not get deeper into the building: police had formed a line and were pushing rioters toward the exit. So, Alford followed the crowd, but

when Alford reached the exit, he chose to remain in the Capitol building, under the breached door's alarm mechanism, even as he watched other rioters being forced out.



(Government Exhibit 106b (above).)

As Alford remained in the Capitol illegally, Alford certainly was paying attention to what was happening around him. While he was inside, another rioter, Ashli Babbitt, was shot in the Speaker's Lobby by a Capitol police officer. Alford posted two videos from inside the Capitol to his Facebook page. One video he titled "Inside Capitol building as girl murdered."




(Exhibit 335 (above).) In one of Alford's videos, rioters can be heard discussing the shooting. In addition, Alford posted to social media about the Ashli Babbitt shooting, "Gunshot. I was right there. Around corner."[3]

---

[3] The other video from the interior of the Capitol Alford posted to his Facebook page was titled "Antifa, BLM, Undercover ops??" Of course, the assault on the Capitol was not and Antifa-BLM

*Alford's Social Media Statements After January 6*

In the aftermath of the riot, Alford displayed an awareness of its purpose and celebrated its goals. He took a photograph of a human skull with hair that evoked the former President's, captioned "Off With Their Heads / Stop the Steal." (Government Exhibit 319.) From his hotel room, he posted a quote from the movie *V for Vendetta*, which is about a plot to blow up the Parliament of a fictionalized, fascist United Kingdom: "People should not be afraid of their governments. Governments should be afraid of their people." (Government Exhibit 327.) He mocked law enforcement officers who dealt with the rioters, comparing them to the doofus character Paul Blart, Mall Cop. (Government Exhibit 328.) He shared a post claiming that the riot was—somehow—"a BRILLIANT TRUMP/MILITARY STING OPERATION" and that "Pence put his own NECK INTO THE NOOSE." (Government Exhibit 330.) And he celebrated the supposed moral righteousness of *his* rioters, as opposed to those *other*, bad rioters: "We stormed the capitol looking for justice. You stormed a Target looking for a big screen TV. We are not the same." (Government Exhibit 331.)

*Alford's Testimony*

At trial, Alford testified and denied acting with the intent to commit any of the charged offenses. Trial Tr. 10/04/2022 at 755. Clearly, the jury did not believe him. In finding Alford guilty, the jury necessarily found that the overall thrust of his testimony incredible. Instead, the totality of the evidence showed that Alford "still feels that [the rioters'] cause was just, that they [the rioters] should have been able to behave the way they did, that they should have been able to go into the Capitol, that they were entitled to be there. . . . He and his people were morally superior

---

undercover operation; Alford's misinformation was an attempt to absolve him and his compatriots of moral responsibility for the harm caused by the riot.

[to the "bad" rioters]." Trial Tr. 10/05/2022 at 1065. But of course, Alford realized that was not a defense. Instead of testifying honestly, he crafted a narrative that attempted to show he accepted (or was willing to live with) the results of the Presidential election, traveled to Washington, D.C. only to see the former President and enjoy the company of like-minded people, was oblivious to the things happening around him on Capitol grounds, and was upset by the conduct of his fellow rioters. None of this was true, and all of it was calculated.

### A. Alford's Testimony About the Former President's Rally

Alford claimed that he traveled to Washington, D.C. because "I wanted to see D.C., I wanted to attend a Trump rally, and I kind of thought that that would probably be the last one, since he was not elected as our president." Trial Tr. 10/04/2022 at 757. Alford later admitted that he was aware of the proceedings to certify the vote of the electoral college, that he was not optimistic about the former President's chances: "I didn't have a lot of hope, but I wanted to witness it for myself." *Id.* at 761. He also claimed that he attended the rally to be around like-minded people and socialize. *Id.* at 757, 774.

This was an 800-mile trip for Alford, *id.* at 757. But strangely, he did not pay attention to the speeches, did not try to view the screens, did not care whether he heard anything through the speakers. *Id.* at 772-74, 884. Instead, he claimed that he mostly cared about being among like-minded people. *Id.* at 774.[4]

Contrary to his testimony, Alford's trip was always about the Electoral College vote; it was always about the Capitol. And via Facebook, Alford was invited to two—and only two—events in Washington, D.C. on January 6, 2021. Alford RSVPed "attending" to the first, which was titled

---

[4]     On cross-examination, Alford resisted acknowledging this, and instead claimed that he wanted to get out of town for a weekend. *Id.* at 884. As he well knew, and acknowledged during direct examination, *id.* at 759, January 6, 2021, was a Wednesday.

"Stop the Steal Jan 6 Capitol Hill," with a location of "First Street NE, Washington, DC 20515." (Government Exhibit 301.) Capitol Hill is, of course, the location of Congress and the riot, not the former President's rally.[5] Another event, titled "Storm the steps of government," with a location designated "United States Capitol," was present in the defendant's Facebook records. *Id.* Although the defendant did not RSVP yes, he—with thousands of like-minded individuals—did storm the steps of the United States government.

### B.  Alford's Testimony Regarding Barricades, and Gaps Between Them

On his way into the Capitol grounds and en route to the Capitol building, Alford navigated through breaches in barricades. Trial Tr. 10/04/2022 at 783-96. Alford argued that other rioters had done the work of moving or destroying these barricades, such that he could not know he was not allowed within the restricted area. Alford claimed that he did not remember seeing the bike racks near the Garfield monument, marking the beginning of the restricted area, *id.* at 785, 789. He claimed, further, that he did not see the bike racks marking the southern end of the restricted area, *id.* at 793. Alford acknowledge that he saw the bike racks as he stepped back onto concrete, from the grass—"If I didn't see them, I would have run into them, I think."—but claimed he did not think about why they were there. *Id.* at 795-96.

Later, though, Alford acknowledged seeing bike rack barriers "all over the place." *Id.* at 894. Though he claimed that "I never crossed one," he acknowledged that he saw the barriers, crossed through openings in the barriers, and knew he was crossing through openings in the

---

[5]     During cross-examination, the defendant resisted acknowledging that he understood what the phrase "Stop the Steal" even meant. Trial Tr. 10/04/2022 at 891-92. When pressed, he told the undersigned, "I didn't use that term. You did." Confronted with the term's presence in his Facebook account, Alford answered, "Yeah. Well, that's – you know, it is what it is."

barriers. *Id.* 894-95. This admission, on cross-examination, was a far cry from his earlier claim that he just failed see any barricades, especially when he entered the restricted area.

### C.  Alford Falsely Denied Knowing That He Entered the Capitol Building Through a Broken-Open Doorway.

Alford claimed that he was unaware the Upper House Door, through which he entered the Capitol, was broken open. Trial Tr. 10/04/2022 at 815-21. He claimed, further, that he did not see the broken glass in the door's windowpane and did not hear the door's alarm sounding. But this is belied by the testimony of FBI Agent Jessica Moore, who participated in an interview of the defendant. During that interview, the defendant told her that he entered the Capitol building through a door that had been broken open. Trial Tr. 09/30/2022 at 454-55.[6]

### D.  Alford Provided False Testimony About His Reaction to the Riot.

At trial, the defendant was asked to explain when he learned the riot was violent and how he reacted to violence. He described the people who broke into the Capitol, on the west side, as "knuckleheads" and said that the events on the west side were "… just ridiculous. There was no reason for all that." Trial Tr. 10/04/2022 at 804, 806. He added, "[t]he president we have to live with, one way or the other. I've lived through other presidents that I didn't agree with, and I was planning on the same thing." *Id.* at 806. The defendant claimed, further that after returning to his hotel, "[w]e had watched the news . . . that evening and realized all the stupid happenings from the whole day and then decided we'd had enough." *Id.* at 844.

---

[6]     At trial, the defense sought to discredit this testimony by arguing the case agent's contemporaneous notes of this interview (which were not Agent Moore's) do not contain the word "broken." Trial Tr. 9/30/2022 at 479-80. Agent Moore explained that she recalled the defendant using the word "broken" when he was interviewed. *Id.* at 480.

As the trial evidence established, this was not the defendant's true reaction to learning about the broader scale of the riot. The defendant documented his feelings on the evening of January 6, 2021, and the early morning of January 7, 2021, from his hotel, via Facebook. And the defendant's Facebook records do not show a person who was surprised by the scale of the riot or embarrassed by the conduct of other rioters. Instead, the defendant: called the news coverage fake, and staged, to keep members of Congress out of being sent to Guantanamo Bay (Government Exhibit 326), proclaimed that "Governments should be afraid of their people" (Government Exhibit 327), and mocked the Capitol Police (Government Exhibit 328). On January 8, 2021, after his return to Alabama, the defendant shared a post that the riot was "a BRILLIANT TRUMP/MILITARY STING OPERATION" which amounted to Vice President Pence putting "his own NECK INTO THE NOOSE" (Government Exhibit 329). And on January 10, 2021, the defendant proudly proclaimed that "We [the rioters] stormed the capitol looking for justice. You stormed a Target looking for a big screen TV. We are not the same." (Government Exhibit 330).

### E.  Alford Offered a Variety of Transparently False Claims About his Knowledge, Motivations, and Conduct

Finally, Alford offered several explanations for his conduct that, while not immediately refuted by some other testimony or tangible evidence, are transparently false. These, too, reflect poorly on his credibility and support an inference that he crafted his testimony. Alford testified that he posted a picture of rioters at the Capitol and captioned it "Patriots" because he saw "all these people standing around in the crowd that love our country." Trial Tr. 10/04/2022 at 814-15. On cross-examination, he offered a similar answer: he called them "patriots" "[b]ecause they were gathered with flags and patriotic memorabilia, or whatever you want to call it, and they were just – they were standing around looking at their own Capitol." *Id.* at 910. He denied knowing why

these other rioters were at the Capitol. *Id.* But obviously, he did know. "Patriots" is a compliment, and here Alford used it to praise the rioters and acknowledge a common cause.

Alford also offered transparently false testimony when he claimed that, in walking away from police officers who were ordering people out of the Capitol building, he was looking for an exit. *Id.* at 899. He claimed that he saw police gesturing to the door "eventually," *id.*, but that when he started to look for an exit, he was lost. *Id.* at 900. But Alford was not lost: he was straight down a hallway from the door he used to enter the Capitol, and he saw officers ordering, and then walking, people to that door. He knew how to leave and chose to go deeper inside the building. And, Alford's claim that he was trying to avoid crowds at the doorway was nonsense: as he walked deeper int the building, there was no crowd at the doorway.

## III.    Statutory Penalties

Alford now faces sentencing on all four counts. As noted by the U.S. Probation Office, Alford faces up to one year of imprisonment for his violations of 18 U.S.C. §§ 1752(a)(1) and (a)(2) and six months imprisonment for his violations of 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). He also faces a fine of up to $100,000. All totaled, Alford faces up to three years in prison for his conduct.

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANAYLSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

*The Government's Objections to the PSR*

The government made two objections to the draft presentence report. Based on earlier court filings by the government, the draft presentence report indicated that Alford remained in the Capitol building from 2:43 p.m. to 2:54 p.m., but according to the facts elicited at trial he left the Capitol building at 2:57 p.m. The defense agrees. Second, the government objected to the Presentence Report's failure to include an enhancement for Obstructing or Impeding the Administration of Justice, pursuant to U.S.S.G. § 3C1.1.[7] The final presentence report includes this enhancement. (ECF No. 8 ¶¶ 18a, 33.) The defense disagrees with the application of this enhancement. The government had no other objections to the PSR and submits that it correctly calculates the defendant's offense level and sentencing range under the Guidelines.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section

---

[7] The government argued for the enhancement to apply based on Alford's false statements about the reasons for his travel (belied by his Facebook records), his false statements that he did not know the Upper House Door was broken open (belied by Agent Moore's testimony), and his false statements about his reaction to learning of the riot on the news) belied, again, by his Facebook records.

3553(a) factors weigh in favor of a sentence of 13 months of incarceration and 12 months supervised release.

### A.  The Nature and Circumstances of the Offense

While assessing Alford's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how Alford entered the Capitol building; (2) whether Alford encouraged violence and/or property destruction; (3) Alford's reaction to such acts; (4) whether, during or after the riot, Alford destroyed evidence; (5) the length of Alford's time inside of the building, and exactly where Alford traveled; (6) Alford's statements in person or on social media; (7) whether Alford cooperated with, or ignored commands from police officers; and (8) whether Alford demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Alford personally engaged in violence or destruction, he would have faced additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts by Alford is therefore not a mitigating factor.

Alford was an eager participant in the attack on the Capitol. He joined the mob near the Garfield Monument. From there, he walked up the West Plaza towards the area of greatest violence, the Lower West Terrace. From there, he walked to the stairs leading to the East Rotunda doors, then made his way inside through the Upper House Doors. Indeed, Alford's travel path makes it appear that he was looking for a way to get inside without braving the crowds. Once inside, Alford recorded video of the rioters chanting "Stop the Steal," banging on doors, and reacting to the shooting of Ashli Babbitt. He later uploaded a video of those reactions to Facebook with the Caption "Girl Murdered at Capitol." He then spread disinformation about the riot online,

falsely claiming that it was staged, and that it the news coverage of the events at the Capitol were "typical liberal b.s."

But far from being appalled by the rioters' brutal assault on police and the chaos at the Capitol, as he falsely told the jury that he was, Alford celebrated the violence as evidence by his Facebook posts after the riots. Significantly, in the days, weeks, and months after January 6, with time for sober reflection on what he had done, Alford had no remorse. To the contrary, two days after the riot, he mocked the violence and the Capitol Police in a Facebook Post.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration.

### B.  The History and Characteristics of Alford

Alford is a small business owner from Hokes Bluff, Alabama. Alford has no prior convictions, and his criminal history score is 0.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of

---

[8] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Alford has accepted no responsibility for his crimes and has shown no remorse for his actions. Most importantly he has demonstrated a profound lack of understanding of the significant impact his crimes, along with those of his fellow rioters, have caused to this nation or the impact of his crime on the victims who suffered acts of violence of the mob that assailed them and the Capitol. Alford's lack of remorse, and his false testimony about his intent and motivations, make

clear that Alford presents a risk of repeating this conduct in the future if he is faced with a political outcome he does not like or a political victory he does not support. A substantial term of incarceration is necessary to specifically deter Alford from any such future crimes, to impress upon him the gravity of his crimes, and to promote respect for the law.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Rivera*, No. 1:21-cr-0060-CKK, the defendant was convicted of four misdemeanor offenses after a bench trial. *See* Findings of Fact and Conclusions of Law, *Rivera*, No. 1:21-cr-0060-CKK, ECF No. 62. The evidence showed that Rivera livestreamed his presence in the Capitol and "He urged his followers watching his Facebook livestream to share his livestream with their friends and followers" and proclaimed he was "about to take [his] ass to the middle of the [United] State[s] Capitol." *See* Sentencing Memorandum, *Rivera*, No. 1:21-cr-0060-CKK, ECF No. 69, pg. 5. Rivera announced to his followers that MPD officers were firing pepper spray at the rioters. *Id.*, at 7. Rivera saw rioters climbing a wall and shouted at them, "there's an easier way up!" Id. Rivera engaged in no violence in the Capitol, and left after approximately 20 minutes. Rivera was convicted of the same four charges of which the defendant stands convicted. The Court sentenced Rivera to eight months in prison. *Rivera*, No. 1:21-cr-0060-CKK, ECF. 82.

In *United States v. Simon*, 1:21-cr-000-cr-00346 (BAH), the defendant pled guilty to a single count of violating 18 U.S.C. 1752(a)(2). Simon traveled to Washington D.C. from Maine where he attended former President Trump's rally before marching to the U.S. Capitol. On the Lower West Terrace Simon briefly joined other rioters in pushing a bicycle rack into a line of officers. He then made his way to the Upper West Terrace where he entered the Capitol through the Senate Wing Door at 2:14 p.m. Once inside, Simon made his way to the Crypt and to the Rotunda. At each location he yelled and chanted in the direction of the police and recorded video of the mob's engagements with the police. Simon's total adjusted offense level, after acceptance of responsibility, was level 11 with a guideline range of 8 to 12 months. The government recommended a sentence of 10 months incarceration, and the court imposed a sentence of 8 months incarceration.

## VI.     Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. See 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under Hughey).[9]  Both require

---

[9] While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v. Zerba,* 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[10] *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[11] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246

---

[10] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[11] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513. Here, the Court should find that Alford's conduct in entering the Capitol building as part of a mob caused damage to that building.

(10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).

By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[12] One of the offenses for which Alford was convicted, 18 U.S.C. § 1752(a)(1), triggers mandatory restitution under the MVRA as an "offense against property" that resulted in pecuniary loss for the Architect of the Capitol, see 18 U.S.C. § 3663A(c)(1)(A)(ii).

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Alford to pay $500 in restitution for his convictions on Counts One through Four. This amount fairly reflects Alford's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement for misdemeanor offenses, $500 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Alford to 13 months of incarceration, 12 months of supervised release, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

*/s/ Michael J. Romano*
Michael J. Romano
IL Bar No. 6293658
Trial Attorney, Detailee
601 D Street, N.W.
Washington, DC 20530
Telephone No. (202) 262-7850
Michael.Romano@usdoj.gov

/s/ James D. Peterson
James D. Peterson
Special Assistant United States Attorney
Bar No. VA 35373
United States Department of Justice
1331 F Street N.W. 6th Floor
Washington, D.C. 20530
Desk: (202) 353-0796
Mobile: (202) 230-0693
James.d.peterson@usdoj.gov